# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 20-13

STATE OF LOUISIANA

VERSUS

TARIK D. NJOKU

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. CR-2017-931
HONORABLE MARTHA A. O'NEAL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## CHARLES G. FITZGERALD
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Chief Judge, Jonathan W. Perry and Charles G. Fitzgerald, Judges.

**AGGRAVATED BATTERY CONVICTION AND SENTENCE AFFIRMED. CRIMINAL CONSPIRACY TO COMMIT AGGRAVATED BATTERY CONVICTION SET ASIDE.**

**Bruce G. Whittaker**
**Louisiana Appellate Project**
**1215 Prytania Street, Suite 332**
**New Orleans, Louisiana  70130**
**(504) 554-8674**
**Counsel for Defendant/Appellant:**
     **Tarik D. Njoku**

**James R. Lestage**
**District Attorney, Thirty-Sixth Judicial District**
**Wayne Bush**
**Assistant District Attorney**
**Post Office Box 99**
**DeRidder, Louisiana  70634**
**(337) 463-5578**
**Counsel for Appellee:**
     **State of Louisiana**

**FITZGERALD, Judge.**

In this appeal, Tarik D. Njoku ("Defendant") appeals his convictions and sentences for aggravated battery and criminal conspiracy to commit aggravated battery.

## SUMMARY OF FACTS AND PROCEDURAL HISTORY

Just after midnight on September 4, 2017, a group of teenaged males from Leesville, Louisiana, traveled to DeRidder, Louisiana, to meet a similar group for a fight. Shots rang out, and two members of the DeRidder group were injured from the gunfire. Several witnesses put Defendant, of Leesville, at the scene of the crime. One witness saw Defendant point a gun and shoot toward the DeRidder group. Another saw Defendant making motions as if he were shooting a gun, but this witness did not actually see a gun in Defendant's hand.

By Bill of Information filed on October 31, 2017, Defendant was charged with attempted first degree murder, in violation of La.R.S. 14:27 and 14:30(A)(3), and with criminal conspiracy to commit first degree murder, in violation of La.R.S. 14:26 and 14:30. At his arraignment, Defendant entered pleas of not guilty. A two-day jury trial was held in March 2019. By unanimous vote, the jury convicted Defendant of aggravated battery, in violation of La.R.S. 14:34, which is a lesser included responsive offense to the charge of attempted first degree murder; the jury also convicted Defendant of criminal conspiracy to commit aggravated battery, in violation of La.R.S. 14:26 and 14:34.

On September 16, 2019, the trial court sentenced Defendant to ten years at hard labor on each count and imposed a fine of $1,500 on the aggravated battery count. The trial court ordered the sentences to run concurrently. Thereafter, on September 17, 2019, Defendant filed a motion to reconsider his sentences, which the trial court denied on September 18, 2019.

Defendant seeks review of his convictions by this court alleging insufficiency of the evidence and excessiveness of his sentences. For the reasons that follow, we affirm Defendant's conviction and sentence for aggravated battery; however, Defendant's conviction for criminal conspiracy to commit aggravated battery is set aside.

## ISSUES FOR REVIEW

This court must decide:

1.  Whether the evidence introduced at trial, when viewed under the standard given in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), is sufficient to prove beyond a reasonable doubt that Defendant is guilty of aggravated battery;

2.  Whether the evidence introduced at trial, when viewed under the standard given in *Jackson v. Virginia*, is sufficient to prove beyond a reasonable doubt that Defendant is guilty of criminal conspiracy to commit aggravated battery; and

3.  Whether the ten-year sentence and $1,500 fine imposed by the trial court for Defendant's aggravated battery conviction is excessive under the standard given in *State v. Barling*, 00-1241, 01-1591 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331.[1]

## LAW AND ANALYSIS

When a defendant raises issues on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court must first resolve the sufficiency issue. *State v. Hearold*, 603 So.2d 731 (La.1992). Therefore, we will first address Defendant's sufficiency arguments.

---

[1] Defendant also seeks review of the excessiveness of the conspiracy sentence, but such a review is unnecessary based on our decision to set aside the conspiracy conviction.

***Standard of Review***

Defendant asserts the evidence at trial was insufficient to prove beyond a reasonable doubt that he committed either aggravated battery or criminal conspiracy to commit aggravated battery.

A sufficiency of the evidence claim is reviewed on appeal under the standard set forth by *Jackson v. Virginia*, 443 U.S. 307. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. "This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521. The appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

A reviewing court must afford great deference to a jury's decision to accept or reject the testimony. *State v. Allen*, 36,180 (La. App. 2 Cir. 9/18/02), 828 So.2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, and 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404 (2004). "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *Id.* at 626.

***Summary of the Trial Testimony***

Corporal Tracy Crouch, of the DeRidder Police Department, testified that just after midnight on September 4, 2017, he responded to a call of a shooting at a basketball court in a small park located between Pinetree Lane and Hillcrest Street in DeRidder. He was the first officer to arrive on the scene. Upon his arrival, he

3

"could see a large group of black males running south on Hillcrest Street to the area of Wisteria Street." He followed the group and then exited his vehicle, telling them to stop. His body camera and dashboard camera recorded the events, and the video recordings were introduced into evidence and shown to the jury.

The video from Corporal Crouch's dashboard camera showed the group of young men in the street when he stopped his vehicle. Some individuals ran off upon his arrival. However, those that remained told Corporal Crouch that they were walking through a field near the basketball court when two trucks passed them. When the trucks circled around a second time, an occupant of one of the trucks yelled something, followed by gunshots. The trucks immediately left the area.

One witness in Corporal Crouch's body-camera recording said he heard at least five shots. While he felt certain that the shooter was a black male, the witness said he had never seen the shooter or the trucks before. The witness did not think the people in the trucks were from DeRidder.

Tyler Thompkins ("Tyler"), who was injured during the shooting, could be seen in the body-camera recording bleeding from a gunshot wound to his right shoulder. The other gunshot victim, Cameron Cross ("Cameron"), had been driven to a local hospital before Corporal Crouch's arrival at the scene.

Corporal Crouch testified that he "recognized a couple of faces" in the group as being from DeRidder. He initially believed the incident was a drive-by shooting, but after questioning the witnesses further, Corporal Crouch explained that "it kind of came to light that . . . the subjects exited the vehicles." Based on his interviews at the scene, Corporal Crouch believed that the gunshots had been fired by a group of individuals from Leesville, Louisiana.

Sergeant Darrin Hall, a detective with the DeRidder Police Department, testified at trial that he also investigated the September 4, 2017 shooting incident.

4

As part of his investigation, he took drone footage of the crime scene, and this video recording was played for the jury. The video depicted cones that were placed on the ground to mark points of interest or physical evidence. For instance, one cone represented the approximate location where Cameron "was shot and went down." Other cones identified where shell casings were located. There was even a cone that marked what Sergeant Hall believed "was the shooters [sic] route into the park." Sergeant Hall concluded from his investigation that the DeRidder group had gathered "[e]ither to witness a fight or participate in a fight." He learned that young man named Nakylan Blake ("Nakylan") from DeRidder organized or agreed to fight Jaron Williams ("LJ") from Leesville.

Angelic Romero ("Angelic") was a high school student who lived near Leesville at the time of the incident in question. After the September 4, 2017 shooting incident, Angelic contacted Crime Stoppers and reported "[t]hat there were accouple [sic] boys that were talking about going and shooting in DeRidder. They were talking about going to fight, but they were talking about bringing a gun." Angelic said they planned to fight "[s]ome of the DeRidder boys – and they were arguing and didn't get along." Angelic identified Jushaun Flammings ("Juju"), LJ, and Samuel Miller ("Sam") as the young men she overheard talking. Angelic testified that she overheard the conversation on September 3, 2017, which was the day before the shooting, while she was sitting outside of the home of her friend Momma K.

Angelic did not recognize Defendant at trial. In fact, she had never met Defendant prior to trial. On cross-examination, Angelic confirmed that Defendant was not present at Momma K's on September 3, 2017. She explained that she called Crime Stoppers because she believed it was the right thing to do. She had not received any type of reward from Crime Stoppers at the time of trial.

Lieutenant James Halbert, also with the DeRidder Police Department, testified that he was the lead detective in the case and had interviewed approximately twenty-seven people, most of whom were teenagers. Lieutenant Halbert stated that he believed the incident began as a fight between LJ and Nakylan over an alleged burglary of Nakylan's home. Apparently, Nakylan thought that LJ committed the burglary so the two agreed to meet to "fight it out." Lieutenant Halbert stated that Nakylan was in the DeRidder group, and LJ was in the Leesville group.

Lieutenant Halbert testified that when he first arrived at the crime scene, he spoke to Christopher Heath ("Christopher"), who provided "an overview of what happened[,] where the shots were fired and where everybody was kind of semi-positioned on the basketball court." Christopher was with the DeRidder group, and he conveyed to Lieutenant Halbert that "shots were fired and everyone started running" before the fight began. Lieutenant Halbert testified that Christopher overheard someone say they were from New Orleans just before hearing a gun being cocked and then gunshots. According to Lieutenant Halbert, LJ was from New Orleans. Lieutenant Halbert also testified that there was no evidence that anyone from the DeRidder group had a gun or any other type of weapon at the time of the incident.

Lieutenant Halbert next explained that Sam and LJ were the first suspects to be arrested. Approximately nine or ten days after the shooting, Defendant and Juju turned themselves in to the Baton Rouge Police Department. Lieutenant Halbert noted that Defendant was living in the Leesville area at the time of the shooting. Larry Williams ("Larry") was the last suspect arrested. He turned himself in to the Leesville Police Department.

Lieutenant Halbert then testified about Andrew Walters ("Drew"). Drew came to the sheriff's office two weeks after the incident. During this original

6

interview, Drew claimed he did not know LJ, Juju, Sam, Larry, or Defendant. Drew explained that he randomly met these five people while he was in Sugartown, Louisiana, and they asked him for a ride to DeRidder.

Drew's story changed during his second interview. This time Drew stated that he drove a blue Chevrolet pickup truck from Leesville to Sugartown with LJ, Juju, Sam, Larry, and Defendant riding as his passengers. According to Drew, they went to Sugartown to watch a fight that never happened. Thereafter, Drew and his five passengers drove to DeRidder. Drew said that he never left his truck while in DeRidder, and that he was not an eyewitness to the shooting. According to Lieutenant Halbert, Drew explained that "[w]hen the shooting started, they jumped in the cars and left." Drew acknowledged in his second interview that he saw one person with a gun; namely, Larry, who was riding in the passenger seat of Drew's pickup truck as they left the scene. According to Drew, Larry jumped into the truck and said "[g]et me out of here."

Lieutenant Halbert noted that eight 22-caliber shell casings were found at the scene. He explained that the casings came from "a semi-automatic weapon, because the shell casings were ejected onto the ground." According to Lieutenant Halbert, most members of the DeRidder group were standing on the basketball court when the shots began. The ultimate location of the shell casings evidenced that at least one shooter advanced toward the basketball court as members of the DeRidder group hid behind nearby bushes or fled by running west along the edge of a tree line toward Hillcrest Street. Lieutenant Halbert testified that he found four shell casings on the night of the incident, and he found two more the following morning. Lieutenant Craig Richard also found two casings in the same vicinity. Lieutenant Halbert stated that all eight shell casings appeared to be from the same manufacturer. He then confirmed that no gun was ever recovered.

7

Lieutenant Halbert identified Defendant at trial. He agreed that Defendant had "grown quite a bit" since his arrest. Commenting about Defendant's hair at the time of the incident, Lieutenant Halbert said it was in "a twist" and shorter than it appeared at trial. When asked about Defendant's height, Lieutenant Halbert—who is five feet ten inches tall—stated that Defendant was "my height or a little taller" at the time of his arrest. During cross-examination, the trial court granted defense counsel's request to have Lieutenant Halbert and Defendant stand next to each other in front of the jury. The police report in evidence reflects Defendant's height as six feet at the time of his arrest.

Lieutenant Halbert testified that he believed Defendant and Larry were the shooters. Lieutenant Halbert also believed that Larry's gun "malfunctioned and it did not work properly when he went to fire," but Defendant's gun did fire. The shell casings recovered from the scene were identified by Lieutenant Halbert and entered in evidence during his testimony. He noted that one of the shell casings was dented and had "mushroomed," which could have resulted from being fired from a dirty, damaged, or poorly manufactured gun. When asked whether he could tell from the casings if "they were fired from the same gun," Lieutenant Halbert remarked that he was "not an expert on that." He stated that no ballistics, fingerprint, or DNA testing was performed on the shell casings.

Lieutenant Halbert testified that he interviewed Tyler's brother, Isaiah Thompkins ("Isaiah"), at the hospital. Tyler was one of the gunshot victims. When shown an Instagram photograph of LJ, Juju, and Sam, Isaiah told Lieutenant Halbert that all three had guns that night. Isaiah said that "Juju . . . was the shooter because of his hair, noting that Juju stood out from everybody else because he had blond highlights in his hair." Later in his statement, Isaiah said Larry and Defendant were also shooting at the DeRidder group.

Lieutenant Halbert also interviewed Cameron, who was the other gunshot victim. Cameron was left paralyzed as a result of his injuries. When asked whether he knew who was present on the night of the shooting, Cameron stated that he recognized Sam, Juju, LJ, Larry, and Defendant. Cameron knew about the fight, and "[h]e went to be back up because he was one of the largest kids in the group, so he wanted to go be the tough big guy in the group. To be intimidating."

Paul Fairly ("Paul") testified that he was part of the DeRidder group, consisting of approximately ten to twelve guys who had walked to the park for a fist fight with some "Leesville guys." Paul stated that he was "[i]n the grass, by the trees" when he saw "[t]rucks. One was white and one was like, black." According to Paul, the vehicles stopped "on the street right behind the basketball court. And they [some of the Leesville guys] walked into the grass." The fight never took place because "[t]he dudes from Leesville" pulled out guns. Paul saw "a dude with dreads pull a gun out. Cocked it – he cocked it and then we ran." Paul did not see anyone else with a gun because he ran away. He heard "[a] lot" of shots fired. He assumed the first shot was fired into the air. He testified that he was unable to describe the person who shot into the air, noting "it was black outside, I couldn't see nothing."

Paul admitted that he had initially told detectives that the shooter was "a muscular guy, a little shorter than Detective Halbert," and that the shooter's hair was in a "dread like twist," explaining that "[d]reads are like real long and twist[s] are not as long." Paul acknowledged that he did not know any of the guys from Leesville prior to the shooting, and he did not recognize Defendant at trial. Paul then noted that the shooter "had hair just like" Defendant had at trial.

Trebreyun Jackson ("Trebreyun"), of DeRidder, testified that he heard about the planned fight between Nakylan and LJ, and thought it was because "somebody stole something from somebody." He went that night "[t]o help, if they need it."

9

According to Trebreyun, a fist fight between Nakylan and LJ did begin, but gunshots were fired fifteen to twenty seconds later. Trebreyun testified that he recognized LJ, Juju, and Sam with the Leesville group. Trebreyun stated that two other guys from Leesville were also there; however, they "had their hoods on and they just started yelling and they raised up and started shooting."

Trebreyun identified Defendant at trial as one of those wearing a hood and having a gun. Trebreyun testified that Defendant "was the tallest one out of everyone out there, he had his hood on. And it was just like not too long, somebody started screaming, like just yelling, and like he just came – popped up in one motion." Defendant "had his hands in his hoody pocket and he just popped up, like threw his hands out and that's when bullets started firing." Then the DeRidder group "just started backing up." Trebreyun stated that he did not know Cameron had been shot "until somebody just started screaming." When asked what he heard when he saw the motion of Defendant's hands, Trebreyun responded: "[T]hat's when we started backing up. And then somebody said, 'that's not what we came for' and they was [sic] like 'huh, huh.' And they just started shooting. But I know that it was more than one gun."

Trebreyun testified that he jumped over a fence and ran to a house at the corner of the basketball court to get away from the gunfire. When the shooting stopped, Trebreyun returned to the court to look for Cameron. He found Cameron lying in the grass. Cameron's brother and his brother's girlfriend had already arrived, and Trebreyun helped them put Cameron into their car so they could drive him to the hospital.

On cross-examination, Trebreyun acknowledged that when he was originally shown the Instagram photograph of LJ, Juju, and Sam, he said he only knew Sam. Trebreyun did not remember stating in his first interview that he did not actually see

10

anyone with a gun. He then reiterated for the jury that he saw Defendant with "his head down with his hood on with his hands in his pockets, he then popped up and then after that bullets started popping." Trebreyun did not remember saying anything about Defendant when he gave his original statement, but he noted that he was not shown a picture of Defendant at that time. Trebreyun insisted at trial that Defendant was there; he was the "[t]allest one out there with a hoody on." He admitted that he could not see Defendant's hair because it was covered by the hoody. Trebreyun clarified that he did not see anyone with a gun, "just motions" like those he had previously described.

Cameron testified that he lived two blocks away from where the shooting occurred. He was at his house with Trebreyun when they heard about the fight, and they walked together to the park to watch. Cameron stated that such fights were fairly common, and that he and his friends would go to "stand around" and observe what was happening. Cameron was at the park "ten to thirty minutes" before the Leesville group arrived. The DeRidder group was starting to leave the park because they thought the Leesville group was not going to show up. Cameron testified he was standing "right on the edge of the court . . . in the far corner." He then explained: "We was [sic] walking away and we heard cars and stuff coming down the street, so they come [sic] back around and speed [sic] fast and came around the corner. They went they brought out their hand guns, they came around."

Cameron was standing about ten to fifteen feet in front of Larry, whom he had heard of but had never met prior to that night. According to Cameron, someone "threw a punch, but it never landed." Then, the Leesville group "just started yelling and everybody got riled up." Cameron described what they said as "[j]ust cuss words and just yelling, really. Just anger towards us, really." Cameron then saw Larry "rack" a gun, i.e., cock it back, and shoot it into the air. He "turned around and ran,"

11

hearing gunshots as he did so. After running about thirty feet, Cameron stated that he "fell and slid on [his] stomach. He explained, "[m]y stomach had like a burning sensation and I couldn't feel my legs, it felt like I was falling into the ground." He could still hear gunshots while on the ground. Cameron told his friends to get his brother, Juwan Johnson, who was not at the fight. Mr. Johnson and his girlfriend took Cameron to the hospital. Once there, Cameron learned that he had been shot from behind in his back and in his right leg.

Cameron identified Defendant at trial. Cameron testified that he knew LJ, Sam, and Defendant because he had played basketball with them in the past. Cameron confirmed that all three of them were present in the park that night. He recalled that Defendant was "the tallest person that was out there." Cameron acknowledged that Defendant looked different in court than he did that night.

On cross-examination, Cameron said he hid behind the bushes with six other people when the two trucks circled the park. He testified, "It was because they had their lights off and stuff and I thought they was [sic] gonna [sic] shoot at us." His fear subsided when the trucks stopped. He recalled that Defendant was wearing a black shirt or hoody that night.

On redirect, Cameron stated that no one from the DeRidder group had a gun, and no one from the Leesville group was shot. Cameron believed more than one gun was fired because he "heard different sounds of the guns." He added that he "had two different size bullets and two different size holes. I had a [.]380 in my back and a different size in my leg."

At trial, Tyler's brother, Isaiah, testified that he walked to the park because he and "the rest of the DeRidder group" were "supposed to be fighting." Isaiah confirmed seeing LJ and Juju from the Leesville group. Isaiah recalled that a fist fight broke out shortly before "someone yelled, 'he got [sic] a gun[.]'" Isaiah turned

12

and ran. According to Isaiah, Tyler was running close behind him, trying to push him out of the way to safety. Tyler was then hit with a bullet in his shoulder. Isaiah recalled "a lot" of shots being fired, explaining that "the first shot had went [sic] in the air, like the second shot it came towards us." The other gunshot victim, Cameron, was Isaiah's cousin.

On cross-examination, Isaiah remembered telling Lieutenant Halbert and Detective Hall that he may have seen guns. Isaiah testified that "either Snoop [Defendant] or Larry" had the guns." Isaiah recalled telling the officers it was Defendant because "[t]hat's what everybody was saying, so that's what I had told them." Isaiah did not remember telling the officers that Sam, LJ, and Juju all had guns that night. He also did not remember telling the officers that Juju was the shooter based on his hair; Isaiah testified that Juju had dreadlocks at the time of the incident. Isaiah ultimately testified that he did not see anyone with a gun; he "just heard the gunshot." Isaiah admitted that he did not know Defendant. When asked if Defendant was at the park, Isaiah responded, "I don't know, I wasn't really – I don't really know if he was there or not."

Sam, a resident of Leesville, admitted at trial that he was involved in the shooting and that he had been charged as a co-defendant. He testified about his original statement given to Lieutenant Halbert prior to his arrest. Sam acknowledged that he was not completely truthful at that time because he felt the officers "were just pressuring me to say what they wanted to hear" and he knew that he was facing a charge of attempted second degree murder and conspiracy to commit second degree attempted murder.

Sam testified that he gave a second police statement on the Monday or Tuesday before trial. He said that he decided to give a second statement because he had "been sitting in jail for almost two years. One of my co-defendants' [sic] that

I'm dear friends got falsely convicted and Cameron and Tyler ain't [sic] really deserve what happened. Because they didn't have nothing [sic] to do with that."

Sam testified that he arrived at the park in Drew's truck with Larry, LJ, Juju, and Defendant/Snoop. He identified Defendant in open court. Sam testified that before going to DeRidder, he and his friends stopped in Sugartown to watch a fight, but it never materialized. They left and headed to DeRidder. When asked to describe what they did upon arriving in DeRidder, Sam testified as follows:

> Umm, hopped out the truck. Everybody in the first truck already went over there, the vehicle I was riding with already went over to the little park area. Then the second truck – they was [sic], some guy came out his house talking about we needed to leave before he called the police. So, I went over there to tell the rest of the guys what happened, when we got there.

Sam explained that he went toward the basketball court "to tell the rest of the people what was going on[.]" He was about ten to fifteen feet from the court when he saw LJ, Larry, Juju, and Defendant standing on the concrete. He confirmed that he knew Defendant; they were in fact schoolmates.

Sam testified that he saw LJ "in the middle of a fight with Nakylan, and then umm – people started coming out of the woods and Juju ran up – and then I heard a rack [from a gun] slide back." Sam then saw Defendant "with something silver in his hand, but at the time I didn't realize what it was. And then after that I heard the first gun shot and I seen [sic] the flame and then I ran." According to Sam, Defendant held the gun straight out as he shot toward the DeRidder group. Sam ran back toward Drew's truck and jumped into the truck bed as he heard "[a]bout nine or ten" gunshots. Defendant joined him in the truck bed shortly thereafter. Sam testified that Defendant did not appear to have the gun with him at that time. The two sat in the bed of the truck in silence as it sped away from the park. During the drive back to Leesville, Drew pulled over so Sam and Defendant could climb inside

14

the passenger compartment of the truck. No one talked about the shooting during the drive home. Sam reflected that "it was quiet. You know, processing everything of what happened, I guess."

Larry was dropped off first at his residence in Pickering, Louisiana. The next stop was Momma K's house in Westwood. Once there, Sam called his mother and asked her to come get him. According to Sam, his mother encouraged him to go to the police. He explained that he "wasn't really feeling that, so – but she talked me into it. But the next morning when I woke up I was wanted for these charges. So, I was like I'm not going up there." Sam had just turned eighteen years old, and he was a senior in high school when the incident occurred.

On the first day of trial, Sam—who was a co-defendant—pleaded guilty to obstruction of justice. He was given a suspended sentence of ten years with felony probation. Sam had been incarcerated for 624 days at the time of his plea agreement. One condition of Sam's plea was that he would testify against Defendant. Sam acknowledged that getting the plea deal was one of the reasons why he decided to give a second police statement. When asked by the prosecution how anyone could now believe him, Sam responded: "If you look at the evidence and you look at what I'm telling you, it's all going to line up. If you lie, the lie will change every time. If you tell you truth [sic], it will never change." Sam then explained that he approached the prosecuting attorneys about making a second statement because he thought what happened to Cameron and Tyler was unfair.

On cross-examination, Sam testified that he had not discussed any plan at Momma K's house the night before the shooting. After identifying Defendant in open court, Sam commented that Defendant looked different at trial than he did at the time of the shooting. Sam viewed a photograph of Defendant taken at the time of his arrest and confirmed that it accurately reflected how Defendant's hair looked

15

on the night of the shooting. The photograph was introduced in evidence; it shows Defendant without dreadlocks.

When asked on cross-examination about the night of the shooting, Sam stated that he went to DeRidder to "assist in a fight." He explained that about "eight, ten" of the DeRidder group came out of the bushes as "the dude and LJ started fighting[.]" Two or three of the DeRidder group were already on the basketball court. Sam added that because those in the second truck from Leesville had not yet arrived, only five or six of the Leesville group were there on the court, leaving them outnumbered about two to one.

Sam testified that he believed Defendant became scared when he saw the DeRidder group "coming out of the tree line." In fact, Sam believed the main reason why Defendant shot his gun was because he was scared. Sam confirmed that he, too, was scared, and that he ran after hearing gunshots. Although Defendant was the only person that Sam saw with a gun that night, he explained he later learned that Larry also had gun, but Larry's gun did not have "a firing pin or clip or nothing like that." When asked whether he disagreed with "other witnesses [who] have testified that Larry Williams shot a gun into the air prior to the rest of the shooting," Sam answered that he did disagree with these witnesses because he "didn't hear any shots, just the racking of a gun."

### Aggravated Battery—Sufficiency of the Evidence

Defendant challenges the sufficiency of evidence presented to convict him of aggravated battery.

A "battery" is defined as "the intentional use of force or violence upon the person of another. . . ." La.R.S. 14:33. More particularly, an "aggravated battery" is defined as "a battery committed with a dangerous weapon." La.R.S. 14:34. "All persons concerned in the commission of a crime, whether present or absent, and

16

whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La.R.S. 14:24.

The Louisiana Supreme Court in *State v. Neal*, 00-674, p. 12 (La. 6/29/01), 796 So.2d 649, 659, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002) (citation omitted), explained that "the defendant's mere presence at the scene is not enough to 'concern' him in the crime. Only those persons who knowingly participate in the planning or execution of a crime may be said to be 'concerned' in its commission, thus making them liable as principals."

Thus, for this court to affirm Defendant's aggravated battery conviction, we must determine whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that Defendant intentionally used force or violence upon the person of another using a dangerous weapon or that he was a principal to these acts by being concerned in, aiding or abetting in, or counseling or procuring another to commit them.

As addressed previously, Trebreyun, who was part of the DeRidder group, identified Defendant at trial as one of those wearing a hood and having a gun. Trebreyun testified that Defendant "had his hands in his hoody pocket and he just popped up, like threw his hands out and that's when bullets started firing." Additionally, Sam, who was part of the Leesville group, testified that he and Defendant were in high school together; that he and Defendant rode in the same vehicle to DeRidder on the night in question; and that he saw Defendant hold a gun out straight out and shoot at the DeRidder group.

As stated by the Louisiana Supreme Court in *State v. Higgins*, 03-1980, p. 6 (La. 4/1/05), 898 So.2d 1219, 1226, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005), "[I]n the absence of internal contradiction or irreconcilable conflict with the physical

17

evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion."

Here, multiple witnesses identified Defendant at the scene of the shooting; Trebreyun testified that he saw Defendant motion as if he were shooting toward the DeRidder group; and Sam testified that he saw Defendant point a gun toward the DeRidder group and open fire. Although Sam was also charged in this incident and benefited from a plea bargain he made in exchange for his testimony, the jury was made aware of that fact, Defense counsel cross-examined him regarding his credibility, and the jury apparently believed his testimony about Defendant's involvement in the shooting.

As summarized by the Louisiana Supreme Court in *State v. Neal*, 796 So.2d at 658-59 (citations omitted):

> [T]he jurisprudence in Louisiana generally holds that an accomplice is qualified to testify against a co-perpetrator even if the prosecution offers him inducements to testify; such inducements would merely affect the witness's credibility. As the United States Fifth Circuit has found, "a conviction may be based even on uncorroborated testimony of an accomplice or of someone making a plea bargain with the government, provided that the testimony is not incredible or otherwise insubstantial on its face." *United States v. Osum*, 943 F.2d 1394, 1405 (5th Cir.1991).

Based on the foregoing, we conclude that a rational trier of fact could have found proof beyond a reasonable doubt that Defendant was guilty of the crime of aggravated battery. It was the jury's prerogative to assess the credibility of the witnesses and to accept or reject their testimony. We will not second guess the jury's credibility determinations nor will we impinge on its role as factfinder. Accordingly, Defendant's aggravated battery conviction is affirmed.

***Conspiracy to Commit Aggravated Battery—Sufficiency of the Evidence***

Defendant also challenges the sufficiency of evidence presented to convict him of criminal conspiracy to commit aggravated battery.

Louisiana Revised Statutes 14:26 provides, in pertinent part:

> A. Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.
>
> B. If the intended basic crime has been consummated, the conspirators may be tried for either the conspiracy or the completed offense, and a conviction for one shall not bar prosecution for the other.

According to *State v. Guillory*, 540 So.2d 1212, 1215 (La.App. 3 Cir. 1989) (citations omitted), "An essential element of the crime of conspiracy is specific intent. Specific intent is defined as the state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."

To affirm Defendant's criminal conspiracy to commit aggravated battery conviction, we must determine whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that Defendant and at least one other person agreed to commit aggravated battery and that either of them acted in furtherance of that crime.

We conclude that the record is absent of any evidence to support Defendant's conviction for criminal conspiracy to commit aggravated battery. Not a single witness testified that Defendant planned or conspired in advance to commit aggravated battery on the DeRidder group. When reviewed under the *Jackson*

standard, the evidence is woefully insufficient to convict Defendant of criminal conspiracy to commit aggravated battery, and that conviction is set aside.[2]

### *Aggravated Battery—Excessiveness of Sentence*

Defendant alleges that the sentence imposed for his aggravated battery conviction is unconstitutionally harsh, excessive, and illegal, noting he had just turned nineteen years old at the time of the shooting. The trial court sentenced Defendant to the maximum term of ten years at hard labor and a fine of $1,500.

This court has previously discussed the standard for reviewing excessive sentence claims:

> [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

*State v. Barling*, 779 So.2d at 1042 (citations omitted).

As we explained in *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789 (citations omitted), *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061:

> In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense

---

[2] We have doubts as to whether criminal conspiracy to commit aggravated battery is a responsive verdict to count two, conspiracy to commit first degree murder. However, as we have found that the evidence was insufficient to support that conviction, we pretermit discussion of this issue.

committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

Louisiana Code of Criminal Procedure Article 894.1 enumerates aggravating and mitigating factors to be considered by the trial court in imposing sentence, and requires that the trial court "shall state for the record the considerations taken into account and the factual basis therefor in imposing sentence." La.Code Crim.P. art. 894.1(C). "While the trial judge need not articulate every aggravating and mitigating circumstance outlined in [La.Code Crim.P.] art. 894.1, the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983).

The Louisiana Supreme Court has instructed that "[m]aximum sentences are appropriately imposed in cases involving the most serious violations of the described offense, and for the worst kind of offender." *State v. Jones*, 398 So.2d 1049, 1053 (La.1981). "The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed." La.Code Crim.P. art. 881.4(D).

In the instant case, Defendant was exposed to a sentence of up to ten years and/or a fine of up to $5,000 for his conviction for aggravated battery. La.R.S. 14:34. The trial court imposed the maximum possible term, albeit with a fine toward the lower end of the sentencing range. In reviewing Defendant's aggravated battery sentence for excessiveness, we will first address sentences imposed in similar cases, followed by a discussion as to the nature and seriousness of the particular offense committed.

In *State v. Tzuanos*, 491 So.2d 826 (La.App. 3 Cir. 1986), the defendant stabbed the husband of his sister-in-law multiple times, resulting in his near death. Although the defendant had been charged with attempted second degree murder, the

jury returned a responsive verdict of aggravated battery. The trial court sentenced the defendant, a first-time offender, to served ten years at hard labor, noting that it would have sentenced him to a higher term had the law permitted. In justifying its imposition of the maximum sentence, the trial court characterized the defendant's actions as "[a]bsolutely inexcusable[,] deplorable and horrible." *Id.* at 827. This court affirmed the sentence, observing that the trial court's comments at the sentencing hearing indicated it had properly considered the guidelines found in La.Code Crim.P. art. 894.1. in tailoring the sentence to the crime.

In *State v. Munoz*, 575 So.2d 848 (La.App 5 Cir. 1991), the seventeen-year-old defendant, unprovoked, punched the fourteen-year-old victim to the ground and forcefully kicked him until he was unconscious, leaving him in a coma. The defendant was charged with attempted second degree murder, but a jury found him guilty of aggravated battery.

> The trial judge described the attack as "brutal" and "vicious" and remarked that although he respected the jury's verdict, he was of the opinion that the defendant possessed the intent to kill at the time of the attack. The trial judge also noted, in response to counsel's argument that were the defendant to be placed on probation restitution payment could be made, that nothing could compensate the victim or his family for what had occurred.

*Id.* at 851. As such, the trial court sentenced the youthful, first-time offender to the maximum sentence of ten years at hard labor. The fifth circuit affirmed the sentence, noting that "[t]he trial judge's extensive comments indicate that he carefully considered the guidelines of C.Cr.P. article 894.1 in determining the appropriate sentence," and that "[n]othing in the record suggests that it was arbitrarily or hastily imposed." *Id.*

In the instant matter, the trial court stated during sentencing that it was "familiar with all aspects of this case[,]" having presided over the five companion cases that arose out of this incident. The trial court noted that Defendant began firing

22

his gun into the crowd of DeRidder teenagers before any punches were thrown between the two young men who had agreed to a fight, thereby creating a risk of harm or death to multiple individuals. The trial court further noted that the two gunshot victims, Cameron and Tyler, were shot as they were running away from the scene; Cameron is now paralyzed because of Defendant's actions, and Tyler has a bullet that remains lodged in his right shoulder. The trial court also considered the "traumatic emotional sufferings" that those present "experienced as a result of the gun shots and their friends being hit by bullets."

Our review of the sentencing transcript reveals that the trial court considered the factors found in La.Code Crim.P. art. 894.1 in particularizing the sentence now in question. Indeed, it is hard to imagine a more serious violation of the crime of aggravated battery. *Jones*, 398 So.2d 1049. Accordingly, we conclude that the trial court did not abuse its wide discretion in sentencing Defendant to the maximum term of ten years at hard labor and a fine of $1,500.

**DECREE**

Tarik D. Njoku's conviction and sentence for count one, aggravated battery, is affirmed. Tarik D. Njoku's conviction for count two, conspiracy to commit aggravated battery, is set aside.

**AGGRAVATED BATTERY CONVICTION AND SENTENCE AFFIRMED. CRIMINAL CONSPIRACY TO COMMIT AGGRAVATED BATTERY CONVICTION SET ASIDE.**